IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 9, 2002 Session

## BENJAMIN BLACKWELL v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Madison County**
**No. C00-319     Clayburn Peeples, Judge**

_____

**No. W2001-02179-CCA-R3-PC - Filed February 12, 2003**
_____

The petitioner, Benjamin Blackwell, was convicted of second degree murder and, on direct appeal, this court affirmed his conviction. Subsequently, the petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel. The post-conviction court dismissed the petition and the petitioner timely appealed. Upon review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

John G. Oliva, Nashville, Tennessee, for the appellant, Benjamin Blackwell.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Alfred Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

A jury in the Madison County Circuit Court found the petitioner guilty of the second degree murder of Craig Williams. Williams' death resulted from a fight between the two men at the Planet Rock bar. On December 29, 1998, this court affirmed the petitioner's conviction and our supreme court denied permission to appeal on September 13, 1999. State v. Benjamin Blackwell, Jr., No. 02C01-9712-CC-00469, 1998 WL 902597 (Tenn. Crim. App. at Jackson, Dec. 29, 1998). Subsequently, the petitioner timely filed a petition for post-conviction relief, which petition the post-conviction court denied. On appeal, the petitioner contends that trial counsel were ineffective in the following ways: (1) failure to pursue an alleged Batson violation and preserve such issue in a motion for new trial; (2) failure to strike a juror; (3) failure to develop or formulate reasonable trial strategy; (4) failure to prepare the petitioner to testify at trial; and (5) failure to preserve a jury instruction

issue for direct appeal. Additionally, the petitioner alleged that appellate counsel was ineffective for failing to comply with Tenn. R. App. P. 14 "in seeking the court's review of Dr. Shull's deposition."

At the post-conviction hearing, Jan Gardner Rochester Patterson, the petitioner's appellate counsel, testified that she began representing the petitioner after the motion for new trial was heard and denied. Thus, on appeal she was bound by the issues raised in the motion for new trial. Patterson stated that she was unaware of any issues relating to jury selection and, therefore, did not pursue this avenue on appeal. Additionally, Patterson noted that she attempted to gain this court's review of the deposition of Dr. Shull, however such attempt was unsuccessful.

Daniel Joseph Taylor, one of the petitioner's trial attorneys, testified that he was an assistant public defender at the time of the petitioner's trial. The district public defender, George Googe, testified that he was the lead counsel on the petitioner's case and, due to the seriousness of the case, he requested Taylor's assistance. The attorneys explained that they frequently discussed the issues in the petitioner's case, but Googe made the ultimate decisions relating to trial strategy.

Taylor observed that he handled the majority of the investigation of the case. Taylor and Googe both noted that the petitioner told the attorneys prior to trial that he had a juvenile record. Because the petitioner's juvenile record would not be an issue at trial, the attorneys did not obtain the records until after trial. However, the attorneys did obtain the petitioner's juvenile records prior to sentencing. Googe asserted that because the petitioner's juvenile record was not an issue at trial, relying upon the petitioner's account of his juvenile record "was proper as far as the preparations for trial."

Both attorneys stated that they were aware that, while a juvenile, the petitioner had been charged with the theft of property under five hundred dollars ($500) from the Garden Plaza Hotel. Additionally, although juror Jeffrey Maness revealed during voir dire that he was the manager of the Garden Plaza Hotel, neither Maness nor the petitioner indicated that they knew one another. When confronted at the post-conviction hearing with a property receipt which revealed that Maness accepted the return of the videocassette recorder (VCR) which the petitioner stole from the hotel, Taylor conceded that the attorneys did not have the receipt prior to trial.

Taylor acknowledged that during voir dire Maness revealed that his father had been killed during an armed robbery five years before the petitioner's trial. Nevertheless, Taylor, Googe, and the petitioner ultimately decided to keep Maness on the jury because Maness had previously worked in a bar. The charges against the petitioner resulted from a fight which began in a bar; therefore, the attorneys believed that Maness could better understand how bar fights erupt and how the petitioner needed to defend himself against the victim's attack.[1] Moreover, both attorneys believed that Maness could be fair and pay attention to the case and would thereby be a good juror. After reviewing the remaining jury pool, the attorneys made a tactical decision to keep Maness on the jury. Taylor could not recall the petitioner objecting to Maness' presence on the jury.

---

[1] The petitioner raised the issue of self-defense at trial.

Prior to the petitioner's criminal trial, there was a civil trial held as a result of the bar fight. In relation to the civil case, Dr. James H. Shull gave a deposition in which he asserted that if the bar, Planet Rock, had not delayed seeking medical attention for the victim, the victim would have survived. In preparation for the criminal trial, Taylor contacted Dr. Shull to inquire if he would be willing to testify on behalf of the petitioner. Initially, Dr. Shull seemed enthusiastic about the prospect. However, Taylor and Googe both asserted that Dr. Shull became unresponsive to further attempts to contact him and eventually seemed hostile to the defense. Accordingly, the attorneys no longer pursued Dr. Shull's testimony. Moreover, Googe asserted that Dr. Shull's deposition would be challenged because it was based upon an "erroneous fact pattern," explaining that Dr. Shull believed that the Planet Rock employees waited an hour to call for aid when in fact they waited only seventeen minutes.

As to the Batson issue, Taylor recalled a potential issue arising during jury selection. After the State challenged two black jurors, Taylor objected and brought the issue to the trial court's attention. Taylor and Googe recalled that the State gave a race-neutral explanation for the challenges. Specifically, Googe remembered that the State challenged the black jurors because of their criminal history. Subsequently, the defense attorneys chose not to pursue the issue. Taylor opined that the defense "didn't raise it during the Motion for New Trial because we didn't think that there would be any merit to it." Neither Taylor nor Googe was aware that the State failed to challenge a white juror who had a previous conviction for driving under the influence (DUI).

Both Taylor and Googe asserted that they met with the petitioner several times prior to trial, either together or individually. During these meetings, the attorneys talked with the petitioner about testifying at trial. Additionally, Taylor and Googe rehearsed with the petitioner the questions they would ask on direct examination and posed several potential cross-examination questions. The petitioner finally decided at a lunch break during trial that he wanted to testify. During that lunch break, the attorneys again reviewed with the petitioner the questions that would be asked during his testimony.

Taylor and Googe maintained that they did not ask the trial court to charge the jury on the possible release eligibility dates for each offense charged. Specifically, Taylor asserted that the attorneys did not want to inflame the jury by having the trial court instruct that a second degree murder conviction carried a sentencing range of fifteen to sixty years and a possible release eligibility after service of eighty-five percent of that sentence, yet the lesser-included offense of voluntary manslaughter carried a sentence of three to fifteen years with release eligibility after service of thirty percent of the sentence. Taylor opined, "[T]hat might discourage the jury from even considering something less [than second degree murder] because it may minimize the death." Googe echoed this sentiment, stating that instructing the jury on the possible release eligibility for the charged offense and the lesser-included offenses "would have almost automatically precluded any consideration by the jury of the lesser offense[s]."

Googe acknowledged that during the closing argument in the petitioner's trial he frequently stated that the killing was not "intentional or knowing." Googe conceded that second

degree murder, the offense with which the petitioner was charged, only required a mental state of knowing. However, Googe explained that his argument also related to the lesser-included offense of voluntary manslaughter, which required either an intentional or knowing mental state.

The petitioner also testified at the post-conviction hearing. He stated that he met with his trial attorneys at least six times prior to trial. The petitioner maintained that he did not realize that Taylor and Googe were preparing him to testify, but acknowledged that they often asked him questions about the offense. Additionally, the petitioner stated that during the lunch break prior to the petitioner's testimony he and the defense attorneys started "preparing pretty heavily" for the petitioner to testify. He further stated that his trial attorneys asked him a few questions in preparation for cross-examination. Nevertheless, the petitioner complained that because of the lack of preparation, he was "nervous" and "tongue tied" during his testimony, thus appearing dishonest to the jury. However, the petitioner asserted that he was honest in his testimony at trial.

The petitioner contended that until preparing to file for post-conviction relief, he was unaware that a potential Batson issue arose during trial. The petitioner also asserted that he informed his trial attorneys of his complete juvenile record, including the Garden Plaza Hotel offense. Regardless, the petitioner admitted that he could not have informed his trial attorneys that Maness was involved in the Garden Plaza Hotel offense because the petitioner himself was not aware that Maness was involved. The petitioner never saw Maness prior to trial and did not know if Maness ever saw him prior to trial. However, the petitioner maintained that he told Taylor and Googe that he did not think that it was a "good idea" to keep Maness on the jury because Maness' father died as a victim of violent crime. The petitioner ultimately deferred to the attorneys' opinion that Maness would be a valuable juror because of his experience working in bars.

At the post-conviction hearing, the State called Jeffrey Maness as a witness. Maness testified that during voir dire at the petitioner's trial he disclosed that he was the general manager of the Garden Plaza Hotel. The petitioner's post-conviction counsel asked Maness to verify his signature on the receipt of property form confirming the return of the stolen VCR. Maness acknowledged that the signature on the form was his. Regardless, Maness asserted that he never saw the petitioner prior to trial. Specifically, Maness maintained that he did not appear in court or prosecute the petitioner on the juvenile theft. Maness conceded that as general manager, he was often required to deal with the police on small matters such as the petitioner's theft. However, Maness repeatedly denied any knowledge or recollection of the petitioner or his offense. Moreover, Maness asserted that his verdict at trial was based upon the proof he heard during the trial. Based upon the foregoing proof, the post-conviction court dismissed the petition for relief.

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C.

Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)).  Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact.  Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).  Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings.  Id. at 578.

The petitioner's complaints concern the ineffectiveness of his counsel at trial and on appeal.  A claim of ineffective assistance of counsel is a mixed question of law and fact.  State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  In Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citations omitted), our supreme court further explained the standard of review in cases of ineffective assistance of counsel:

> [A post-conviction] court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. However, a [post-conviction] court's *conclusions of law*--such as whether counsel's performance was deficient or whether that deficiency was prejudicial--are reviewed under a purely *de novo* standard, with no presumption of correctness given to the [post-conviction] court's conclusions.

"To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense."  Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)).  Both prongs of the test must be met; accordingly, this court need not grant relief if the petitioner has made an inadequate showing of either deficiency or prejudice.  Id. at 370.  In evaluating whether the petitioner has met his burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases.  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  Additionally, this court should refrain from second-guessing tactical and strategic decisions by defense counsel at trial and on appeal.  Henley, 960 S.W.2d at 579.

The petitioner first complains that trial counsel were ineffective for "letting the [Batson] issue drop."  In other words, the petitioner alleges that counsel should have pursued the issue after the trial court ruled upon the issue and should have raised it in the motion for new trial in order to preserve the issue for appeal.

In Batson v. Kentucky, 476 U.S. 79, 89, 106 S. Ct. 1712, 1718 (1986), the Supreme Court ruled that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."  In order to prove a Batson violation, the petitioner must first establish a prima facie case that the juror is being challenged on the basis of race.  State v. Stout, 46 S.W.3d 689, 709 (Tenn. 2001) (appendix), cert. denied, 534 U.S. 998, 122 S. Ct. 471 (2001).  If the

petitioner makes such a prima facie showing, the State must then articulate a race-neutral reason for the challenge. Id. At that point, the trial court must determine whether purposeful discrimination has been proven. Id. We note that "[b]ecause the core issue is the prosecutor's discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'" State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992) (quoting Batson, 476 U.S. at 98 n. 21, 106 S. Ct. 1724 n. 21). "[O]n appeal, the trial court's finding that the State excused a venire member for race-neutral reasons will not be reversed unless it is clearly erroneous." State v. Carroll, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000).

At the petitioner's trial, Taylor raised an objection after the State challenged a second black juror. In response, the trial court observed that the State had challenged two white jurors and two black jurors. The trial court stated that it saw no reason to ask the State to explain the challenges, implicitly ruling that the petitioner failed to make the requisite prima facie showing of discrimination. The court observed that it would not require an explanation unless "we see . . . something developing that looks like a racial thing. . . .  I see no pattern here developing." Regardless, the State explained the challenges by stating that

> [o]ne of those two individuals we put in the workhouse for child
> support payments. That was the main reason we challenged him.
> And the other one, there's something on the police record. I can't
> remember what it is right now. But he sat on some other juries, and
> I just don't think he's been a very good juror. That's the reason we
> challenged the other juror.

The State further assured the trial court that it was not challenging jurors on the basis of race.

The petitioner argues that the trial court improperly required a "pattern" of challenges in order to find a prima facie case of discrimination. We agree that proof of a pattern of discrimination is not a prerequisite to prove a Batson violation. See State v. Theddaeus Medford, No. W2001-02930-CCA-R3-CD, 2003 WL 141049, at *3 (Tenn. Crim. App. at Jackson, Jan. 14, 2003). However, even if the petitioner made a prima facie showing of discrimination, the trial court was satisfied that the State offered race-neutral explanations for the challenges. Thus, trial counsel were not ineffective for failing to pursue the issue. Moreover, trial counsel determined that there was no merit to the Batson issue and therefore did not pursue the issue in a motion for new trial. Despite the petitioner's argument that a white juror who had a previous DUI conviction was unchallenged, no proof exists in the record that the State was aware that juror also had a criminal record. Additionally, the State also explained that one juror was challenged because of the State's experience with that juror from previous trials. See State v. Mark Lee Dale, No. M2001-01205-CCA-R3-CD, 2002 WL 1204933, at *2 (Tenn. Crim. App. at Nashville, June 5, 2002). We conclude that the petitioner has not proven by clear and convincing evidence that counsel were deficient on this issue, nor has he shown that he suffered any prejudice from counsel's failure to pursue the Batson issue.

The petitioner also claims counsel were ineffective "by not advising [the petitioner] of the *in camera* Batson hearing, effectively denying him the chance to have a full hearing on it to challenge the State's position, to include this issue in the Motion for New Trial and to have it

reviewed by appellate court[s] for error." However, as we noted earlier, the petitioner has failed to demonstrate that he suffered prejudice in relation to his Batson claim. This issue is without merit.

The petitioner next argues that trial counsel were ineffective in failing to remove Maness from the jury because he "was previously involved in [the petitioner's] juvenile court prosecution." Furthermore, the petitioner contends that "[l]eaving [Maness,] the manager of the prosecuting hotel[,] on the jury was not a tactical or strategic decision; it was lack of preparation." We disagree.

Both Taylor and Googe testified at the post-conviction hearing that they felt Maness would be a valuable juror because of his previous experience working in bars. As the fight underlying the petitioner's charge began in a bar, the attorneys felt that Maness would be more understanding of the petitioner's plight. In fact, due to Maness' previous bar experience, Googe felt that Maness might be a "ringer" on the jury. Therefore, the decision to keep Maness as a juror was clearly tactical. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Further, Maness' name was not included on the juvenile court judgment against the petitioner or in the police report. Thus, there is no proof in the record that Maness was active in the prosecution of the petitioner as a juvenile. Notably, Maness' name only appeared on the property receipt acknowledging the return of the stolen VCR. Googe testified that unless a conviction was specifically an issue at trial, it was not his practice to obtain property receipts or juvenile records. Based upon the record before us, we conclude that counsel were not ineffective for failing to obtain the property receipt. Furthermore, both the petitioner and Maness testified at the post-conviction hearing that they did not recognize each other. Maness specifically maintained that he based his decision to convict the petitioner solely upon the proof he heard at trial. See Hershell Lee Kinnaird v. State, No. M2000-00037-CCA-R3-PC, 2001 WL 881371, at *11 (Tenn. Crim. App. at Nashville, Aug. 7, 2001), perm. to appeal denied, (Tenn. 2001). Accordingly, the petitioner has failed to prove prejudice in connection with this issue.

In arguing that trial counsel failed to develop a reasonable trial strategy, the petitioner specifically complains that counsel did not know the difference between the mental states of intentional and knowing. The petitioner's dissatisfaction relates to Googe's closing argument in which he repeatedly argued that the killing was neither "knowing" nor "intentional," thus confusing the jury. In sum, the petitioner complains that counsel erred by arguing that the petitioner did not intend to kill the victim because second degree murder, the charged offense, required only a knowing mental state.

At the post-conviction hearing, Googe stated that he simultaneously discussed knowing and intentional mental states. He explained that "to some extent" he was attempting to speak "in layman's terms." Additionally, Googe was attempting to gain an acquittal for the petitioner by arguing against the lesser-included offense of voluntary manslaughter, which requires either an intentional or knowing mental state. Moreover, the trial court interrupted Googe's closing argument to explain to the jury that "the instructions [on second degree murder] will only refer to

the word knowing. But, again, the word intentional does include knowing." The trial court later instructed the jury correctly on the applicable mental states for each offense charged. See State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001). Again, the petitioner has failed to establish counsel's deficiency and any resulting prejudice.

The petitioner also complains that trial counsel failed to fully prepare him to testify at trial. Both Googe and Taylor testified at the post-conviction hearing that they repeatedly prepared the petitioner to testify, asking him direct examination questions and potential cross-examination questions. In the petitioner's own testimony at the post-conviction hearing, he conceded that counsel would often ask him questions, but "I never knew that they were actually preparing me to testify." However, the petitioner also admitted that counsel told him "the majority" of the questions that they would ask and that he knew the answers to those questions. The trial court found that counsel "did what was reasonably proper to prepare the petitioner to testify in this case," implicitly accrediting the testimony of counsel. See Jay A. Cameron v. State, No. M1998-00005-CCA-R3-CD, 2000 WL 1209450, at *4 (Tenn. Crim. App. at Nashville, Aug. 18, 2000), perm. to appeal denied, (Tenn. 2001). We likewise conclude that counsel were not deficient in preparing the petitioner to testify at trial. Additionally, the petitioner has not established that he was prejudiced by any alleged failure. See King David Johnson v. State, No. M2000-02756-CCA-R3-PC, 2001 WL 1103434, at *2 (Tenn. Crim. App. at Nashville, Sept. 20, 2001). This issue is without merit.

The petitioner next contends that counsel were ineffective in failing to raise in his motion for new trial the issue of improper jury instructions as to the range of punishment, thereby waiving this issue on appeal. The petitioner summarily alleges that "[h]ad it been properly preserved, the jury instruction issue would likely have been a ground upon which relief should have been granted." At the time of the petitioner's trial, "either the defendant or the State could request the trial court to charge the jury on the range of punishment for a criminal offense." State v. Isaac Milholen, No. 02C01-9810-CC-00316, 1999 WL 562214, at *4 (Tenn. Crim. App. at Jackson, Aug. 3, 1999); see also Tenn. Code Ann. § 40-35-201(b)(1) (1997). On direct appeal, this court noted that any complaint as to the jury instruction on range of punishment was waived by the petitioner's failure to include the issue in the motion for new trial. Blackwell, No. 02C01-9712-CC-00469, 1998 WL 902597, at *8. This court further observed that the issue did not qualify as plain error. Id. The trial court did instruct the jury on the possible length of sentences for the charged offense and the lesser-included offenses; however, the trial court did not instruct on any possible release eligibility. At the post-conviction hearing, trial counsel explained that they made a strategic decision not to request an instruction regarding the release eligibility for each offense because counsel feared such an instruction would encourage the jury to ignore any lesser-included offenses. Because counsel made the strategic decision to exclude the release eligibility instruction, they were precluded from raising the issue in the motion for new trial. This court may not "second guess" counsel's tactical or strategic choices made in the course of trial. Hellard, 629 S.W.2d at 9. The petitioner has not proven by clear and convincing evidence that counsel were deficient in making this strategic choice. The petitioner is not entitled to relief on this issue.

Finally, the petitioner contends that his appellate counsel were ineffective in failing to comply with Tennessee Rule of Appellate Procedure 14 in seeking this court's review of Dr. Shull's deposition. In support of his argument, the petitioner alludes to this court's opinion on direct appeal, in which we stated, "We decline to accept the defendant's request to review this deposition, since this evidence was not contemplated by Rules 13(c) and 14 of the Tennessee Rules of Appellate Procedure." Blackwell, No. 02C01-9712-CC-00469, 1998 WL 902597, at *5. The petitioner argues that "[b]y failing to properly request the appellate court to consider such a deposition under the applicable appellate rules, counsel's conduct fell below the standard for appellate counsel." The petitioner misconstrues this court's ruling.

Tennessee Rule of Appellate Procedure 13(c) observes that, on appeal, appellate courts "may consider those facts established by the evidence in the trial court and set forth in the record and any additional facts that may be judicially noticed or are considered pursuant to Rule 14." Rule 14 provides, "The Supreme Court, Court of Appeals, or Court of Criminal Appeals on its motion or on motion of a party may consider facts concerning the action that occurred *after* judgment." Tenn. R. App. P. 14(a) (emphasis added). In the instant case, the record clearly reflects that Dr. Shull's deposition was given *prior* to the petitioner's trial. Accordingly, as we previously observed, "this evidence was not contemplated by Rules 13(c) and 14 of the Tennessee Rules of Appellate Procedure." Blackwell, No. 02C01-9712-CC-00469, 1998 WL 902597, at *5. As such, we conclude that the petitioner's appellate counsel was not deficient in failing to gain this court's consideration of Dr. Shull's deposition. This issue is likewise without merit.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_____
NORMA McGEE OGLE, JUDGE

-9-